# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RUDY FRANK FABELA,

        Defendant-Appellant.

UNPUBLISHED
June 26, 2018

No. 337365
Allegan Circuit Court
LC No. 16-019935-FH

Before: MURRAY, C.J., and HOEKSTRA and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of two counts of third-degree criminal sexual conduct (CSC-III) with a victim at least 13 years of age but under 16 years of age, MCL 750.520d(1)(a). The trial court sentenced defendant to serve concurrent terms of 51 months to 180 months in prison for each conviction and credited defendant for 85 days of time served. For the reasons explained below, we affirm but remand to correct the judgment of sentence to reflect that defendant should have received credit for 95 days of time served in jail.

## I. FACTUAL BACKGROUND

In approximately 2012, defendant met and became close friends with Shandra Dominguez at their mutual workplace. Ms. Dominguez testified that defendant became like a brother to her and that, in September 2015, he moved into the home where she resided with her four children. Ms. Dominguez testified that defendant was also close with her children, seemingly serving as a father figure to her daughter CD, who had been struggling with the absence of her father since he had been deported six years earlier.

CD testified that her relationship with defendant became romantic in November 2015, when CD was 15 years old and defendant was 31 years old. According to CD's testimony, she and defendant had sexual intercourse approximately ten times between November 2015 and January 2016. In November 2015, CD learned that she was pregnant. Ms. Dominguez testified that she learned of CD's pregnancy in January 2016, and although CD refused to identify the father, Ms. Dominguez confronted defendant. Defendant denied being the father; however, he immediately moved out of the family's residence, quit his job, and cut off all communication with Ms. Dominguez. Shortly thereafter, Ms. Dominguez discovered a cell phone she recognized as belonging to defendant hidden in CD's closet. She testified that the phone contained a video of defendant and CD kissing and declaring their love for each other. On

-1-

approximately January 7, 2016, Ms. Dominguez reported defendant to the Kentwood Police Department.  Although Ms. Dominguez forbade CD from seeing defendant, CD admitted that she continued to see him.

On February 3, 2016, CD took the bus to school, where defendant immediately picked her up in his vehicle.  CD testified that she intended to run away with defendant and that the two had sexual intercourse that night and the following morning.  Further, CD testified that she loved defendant and that he did not force her either to leave her home or to have a sexual relationship with him.  Detective Kelly Baldwin of the Kentwood Police Department testified that on February 4, 2016, she investigated a missing person report regarding CD.  Detective Baldwin stated that, after finding CD at a movie theater, she seized CD's clothing for inspection.  Ann Hunt and David Hayhurst, forensic scientists at the Michigan State Police laboratory, both testified that CD's underwear tested positive for seminal fluid matching defendant's DNA.

Defendant was charged with two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b, taking place on or about February 4, 2016.  The charges against defendant proceeded to trial, and the jury ultimately found him not guilty of two counts of CSC-I, but guilty of two counts of the lesser included offense of CSC-III, MCL 750.520d(1)(a).  The trial court sentenced defendant to concurrent terms of 51 to 180 months in prison for each conviction, with 85 days of sentence credit for time served.

## II.  DISCUSSION

### A.  SEX OFFENDERS REGISTRATION ACT

Defendant first contends that his mandatory registration under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, amounts to cruel or unusual punishment. Although this Court has previously rejected this argument in a number of cases, defendant maintains that they were wrongly decided and invites the Court to reconsider those decisions. Alternatively, he compares the present case to other cases in which SORA was found to be unconstitutional as applied.  We reject defendant's arguments.

Because defendant failed to raise this issue before the trial court, it is unpreserved.  See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016).  Generally, this Court reviews de novo issues of constitutional law, *People v Bosca*, 310 Mich App 1, 56; 871 NW2d 307 (2015); however, unpreserved claims of constitutional error are reviewed for plain error affecting the defendant's substantial rights, *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to establish a plain error warranting relief, the defendant must show that the error was plain or obvious and that it affected the outcome of the lower court proceedings.  *Id.*

The Michigan Legislature enacted SORA to protect the public by requiring an individual who has been convicted of a listed offense to register as a sex offender.  See MCL 28.723. Under SORA, CSC-III is considered a Tier III offense.  MCL 28.722(w)(*iv*).  The Legislature, however, provided that CSC-III would not constitute a Tier III offense if the victim consented to the conduct and if the defendant was not more than four years older than the victim.  MCL 28.722(w)(*iv*).  Here, because defendant was more than four years older than CD, this statutory exception is inapplicable.  As such, defendant's convictions constitute Tier III offenses, and he

will be required to register in compliance with SORA, MCL 28.723(1), and maintain this registration for life, MCL 28.725(12).

As defendant recognizes on appeal, this Court has repeatedly upheld SORA's registration requirements and determined that those requirements do not amount to punishment, let alone cruel or unusual punishment. See *Bosca*, 310 Mich App at 72-73, appeal held in abeyance by unpublished order of the Michigan Supreme Court, entered May 25, 2018 (Docket No. 151610) (holding that "this Court has consistently ruled that SORA's registration requirement, as applied to adult offenders, does not constitute punishment" and therefore does not constitute cruel or unusual punishment); *People v Fonville*, 291 Mich App 363, 381; 804 NW2d 878 (2011) (holding that SORA's registration requirement does not amount to a "a punitive measure intended to chastise, deter or discipline an offender" (quotation marks and citations omitted)). Rather, SORA registration is considered "merely a 'remedial regulatory scheme furthering a legitimate state interest.' " *Fonville*, 291 Mich App at 381, quoting *People v Golba*, 273 Mich App 603, 617; 729 NW2d 916 (2007); see also *People v Pennington*, 240 Mich App 188, 197; 610 NW2d 608 (2000) ("[W]e conclude that the legislation in issue, directed at protecting the public and having no punitive purpose, does not violate the prohibition against ex post facto laws."). Because these decisions establish binding precedent, see MCR 7.215(J)(1), we decline defendant's invitation to reconsider them.

Defendant maintains that *Bosca* and *Fonville* were wrongly decided and urges this Court to adopt the rationale set forth by the United States Court of Appeals for the Sixth Circuit in *Does #1-5 v Snyder*, 834 F3d 696 (CA 6, 2016). In *Snyder*, the Sixth Circuit held that SORA imposes punishment and that its retroactive application to the plaintiffs was unconstitutional under the Ex Post Facto clause of US Const, art I, § 10. *Snyder*, 834 F3d at 705-706. However, unlike previously published decisions of this Court, decisions by the federal courts other than the United States Supreme Court are not binding on this Court. See *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004). Because the earlier decisions of this Court are binding, MCR 7.215(J)(1), we are not at liberty to follow a conflicting decision rendered by the Sixth Circuit.

Defendant also contends that this Court's decision in *People v Dipiazza*, 286 Mich App 137; 778 NW2d 264 (2009), is controlling in the present case. *Dipiazza* involved a consensual sexual relationship between an 18-year-old defendant and his 14-year-old girlfriend, whom he later married. *Id*. at 140. The defendant was adjudicated under the Holmes Youthful Trainee Act (HYTA), see MCL 762.11 *et seq*., for attempted CSC-III, and, after he successfully completed probation, his case was dismissed with no conviction on his record. *Id*. at 140. But because he was assigned trainee status only weeks before the Legislature modified SORA to exclude trainees from registration requirements, the defendant was compelled to register. *Id*. at 143. This Court considered the "devastating effects" SORA registration had on the defendant, which frustrated the purpose of the HYTA to prevent trainees from " 'suffer[ing] a civil disability or loss of right or privilege.' " *Id*. at 150-153, quoting MCL 762.14(2). Accordingly, this Court concluded that the registration requirement amounted to cruel or unusual punishment as applied to the defendant. *Id*. at 156-157.

The present case is readily distinguishable from *Dipiazza*. Far from the teenage defendant involved in a sexual relationship with his girlfriend four years his junior, defendant in

this case was 31 years of age when he engaged in a sexual relationship with a 15-year-old living in the same household. More significantly, defendant has been convicted and was not adjudicated under – nor was he eligible to be adjudicated under – the HYTA. Accordingly, *Dipiazza* is inapposite. To the extent that defendant emphasizes that his relationship with CD was consensual, MCL 28.722(w)(*iv*)[1] provides that, even if a victim consents to a sexual relationship, CSC-III remains a Tier III offense if the defendant is more than four years older than his or her victim. Accordingly, the Legislature has clearly conveyed its intent that persons, such as defendant, who are more than four years older than a victim are subject to SORA registration requirements.

Finally, defendant requests that his appeal be held in abeyance pending our Supreme Court's resolution of the appeal in *People v Temelkoski*, 307 Mich App 241; 859 NW2d 743 (2014), rev'd 905 NW2d 593 (2018). Our Supreme Court has now issued its decision reversing this Court's judgment that the defendant was required to register under SORA. *Temelkoski*, ___ Mich ___; 905 NW2d 593, 593 (2018). In *Temelkoski*, after the defendant pleaded guilty to second-degree criminal sexual conduct, he was adjudicated under the HYTA, and the case against him was ultimately dismissed without a conviction upon his successful completion of probation. *Temelkoski*, 307 Mich App at 244. However, the defendant was required to register under SORA, which took effect after he pleaded guilty. *Id*. Our Supreme Court determined that retroactive application of SORA's registration requirements to the defendant violated due process, as the defendant's guilty plea was induced by the benefit of receiving a HYTA disposition, thus avoiding the civil impairments that would have resulted from a conviction. *Temelkoski*, 905 NW2d at 594. However, the Supreme Court did not address whether SORA imposed a punishment or whether it constituted cruel or unusual punishment. *Id*.

Because the Supreme Court's decision in *Temelkoski* concerns a defendant who was adjudicated under HYTA, it is inapplicable here. Moreover, unlike the defendant in *Temelkoski*, defendant did not plead guilty; he was tried, found guilty, and convicted. Finally, the application of SORA in defendant's case is not retroactive, as he committed the offenses at issue after the statute's enactment and amendment. Our Supreme Court's decision is thus unavailing to defendant's argument. Accordingly, as we are bound to follow the prior decisions of this Court upholding the constitutionality of SORA's registration requirements, MCR 7.215(J)(1), we conclude that defendant's mandatory SORA registration does not amount to cruel or unusual punishment.

## B. OFFENSE VARIABLE 10

Defendant next argues that the trial court erred by assessing ten points for Offense Variable (OV) 10 of the sentencing guidelines when there was no evidence that he exploited CD's vulnerability in committing CSC-III. We disagree.

---

[1] The Legislature amended SORA to add MCL 28.722(w)(*iv*) in direct response to *Dipiazza*. *People v Temelkoski*, 307 Mich App 241; 859 NW2d 743 (2014), rev'd ___ Mich ___; 905 NW2d 593 (2018)

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Whether the factual findings are sufficient to support the trial court's determinations relative to scoring "is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

OV 10, MCL 777.40, governs the assessment of points for the exploitation of a vulnerable victim and provides as follows:

> (1) Offense variable 10 is exploitation of a vulnerable victim. Score offense variable 10 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (b) The offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status ………………………………………………………………………….. 10 points

"Exploit" is defined by the statute as "to manipulate the victim for selfish or unethical purposes." MCL 777.40(3)(b). The statute provides that "[t]he mere existence of 1 or more factors described in subsection (1) does not automatically equate with victim vulnerability." MCL 777.40(2). Accordingly, a victim's youth alone is an insufficient basis to score this variable. Rather, a victim is "vulnerable" if he or she exhibits a "readily apparent susceptibility . . . to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c).

In addressing defendant's objection to the calculation of his score, the trial court did not discuss the evidence in support of assigning ten points for OV 10, merely stating that a preponderance of the evidence established that defendant had exploited the victim's youth. However, in deciding an appropriate sentence, the trial court more fully analyzed how defendant had exploited CD's family situation and youth:

> What did the defendant do? Well, he came into this family's picture, the family of the 15 year old victim as a co-employee of the mother, then a friend to the mother, then eventually a roommate in the house who was not engaged in an intimate relationship with the mother of the victim. But he was welcomed into the house because he needed a place to stay and one gets the impression the mother needed the rent money that could generate. There's nothing wrong with that. But it became something else and the defendant didn't—had plenty of opportunities to withdraw when he felt temptation surging. But no, did he? No, he betrayed the mother of this child and then betrayed the immaturity of the child which he pretended to have some actual genuine human appreciation of her immaturity, of her fragility. He was helpful to the children. Now in retrospect I see that only as scheming with some kind of advantage. It's kind of heartless for somebody [31] years old to be taking advantage of a 15 year old and I don't care how ardently the 15 year old solicits attention. This 15 year old doesn't have the maturity to decide when to have sexual relations.

Overwhelming evidence supports the trial court's finding that defendant exploited CD's youth and her family situation. According to Ms. Dominguez, defendant was well aware that CD was struggling to cope with her father's deportation, as defendant participated in some of her counseling sessions. Ms. Dominguez stated that defendant did many of the things for CD that a father would do and that, as a result, CD became clingy with him. The evidence establishes that, far from discouraging CD's affections, defendant recorded video professing his love for her. Additionally, defendant was aware that Ms. Dominguez would disapprove of a relationship between CD and himself, as he moved out of the home and quit his job immediately after she developed suspicions. Nonetheless, defendant secretly continued a sexual relationship with CD.

This evidence permits an inference that defendant was aware that CD was struggling with the loss of her father and sought the attention of an adult male. It also permitted an inference that defendant provided the attention that she desired and used his involvement with her family to spend time with her alone. That is, the trial court could, on the basis of this evidence, find that it was readily apparent to defendant that, because of her youth and family situation, CD was susceptible to persuasion or temptation by an adult male who provided her with the affirmation and attention she desired. See MCL 777.40(3)(c). Defendant eventually professed his love for CD, engaged in romantic behaviors, and allowed his relationship with her to become sexual. Based on these facts, the trial court could reasonably find that defendant exploited CD's youth and family situation to convince her that they were in love and encourage her to voluntarily engage in sexual relations with him. See MCL 777.40(3)(b). We thus conclude the trial court did not err in assigning ten points for OV 10.

## C. CREDIT FOR TIME SERVED

Defendant next argues that the trial court erred when it relied on the presentence investigation report (PSIR) to calculate his credit for time served because the PSIR erroneously indicated that the date of sentencing was December 9, 2016, ten days earlier than the actual date of sentencing on December 19, 2016. The prosecution concedes this error on appeal. Consequently, we agree that defendant is entitled to correction of the judgment of sentence to reflect credit for 95 days already served. See MCL 769.11b.

## D. EXTRANEOUS INFLUENCE ON THE JURY

Defendant contends in his Standard 4 brief that the jury was improperly exposed to extraneous influence when the trial court directed the prosecuting attorney and a detective to escort prospective jurors to the jury room for the duration of a lock down drill that occurred during voir dire. We reject defendant's argument.

This Court reviews de novo questions of constitutional law. See *People v Rose*, 289 Mich App 499, 505; 808 NW2d 301 (2010). However, because defendant failed to preserve this issue by raising it before the trial court, see *Bass*, 317 Mich App at 272, this Court reviews the matter for plain error affecting the defendant's substantial rights, see *Carines*, 460 Mich at 763.

A defendant has an absolute right to an impartial jury. *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994) (opinion by MALLETT, J.). That right includes the right to have the jury consider during their deliberations only the evidence presented in open court. *People v*

*Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." *Id*. To establish that a jury was improperly influenced by extraneous information, a defendant must prove two elements: (1) "that the jury was exposed to extraneous influences," and (2) "that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict." *Id*. at 88-89. If the defendant establishes these two elements, then the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id.*

During voir dire on the first day of trial, the trial court informed the jury that a test drill for lock down training would take place later in the day. The court anticipated that the drill would occur sometime before 3:00 p.m. and informed the persons in the courtroom how the drill would proceed:

> Detective Gardiner and Ms. Koch [the prosecutor] are going to remove themselves with the jurors in the box and the jurors in the front of the box to the jury room, close and lock the door and remain there until we get an authoritative voice that it's all clear. The spectators and prospective jurors back in the jury— the gallery area, along with myself and Mrs. Meade and Ms. Hiscock will go through that door to my left and into the chambers area and the area just outside chambers. Alright? The defendant and Mr. Johnson will go in a nearby separate area. Everybody understand what their location assignment is going to be?

The trial transcript indicates that, after the alarm went off, the court recessed at 3:15 p.m. and reconvened at 3:21 p.m.[2] Thereafter, the court continued with voir dire until the panel was sworn at 4:28 p.m.

Defendant maintains that the jury was exposed to extraneous influences during the drill because the prosecutor and detective escorted the jury to the jury room for the duration of the drill. The record, however, does not reflect whether the prosecutor or detective actually escorted the jury to the jury room in accordance with the trial court's earlier instruction. Even assuming they did, defendant has presented no evidence that they discussed the trial with the jurors or otherwise attempted to influence the jury. Defendant's argument simply presumes, with no basis in fact, that such attempts occurred, when the contrary presumption that no such attempts took place is equally likely. Such bald assertions are insufficient to sustain findings either that the jury was exposed to an extraneous influence or that such an influence affected the jury's verdict. See *People v Nick*, 360 Mich 219, 231-232; 103 NW2d 435 (1960) (holding that a mere possibility of prejudice is insufficient to set aside a jury verdict and that "the improper remark of a stranger, not shown to have been given consideration or even heard, does not justify a conclusion that prejudice to defendant may have resulted").

---

[2] To the extent that defendant has questioned the accuracy and reliability of the trial transcript on appeal, he has abandoned any such claim by failing to offer any meaningful discussion of the issue. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006).

Moreover, immediately before recessing for lunch at 12:34 p.m., the trial court admonished the jury as follows:

> During this break don't perform any research, don't allow anybody to discuss any aspect of this case or the witnesses that have been discussed in the court hearing today to any degree on any related subject and don't let anybody discuss it in your presence. If they do tell them you're on jury duty and can't engage or listen to such conversation and report that to me as soon – or to Mrs. Meade as soon as you come back.

The trial court repeated this warning when it delivered the jury instructions after the panel was sworn. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Accordingly, we may presume that the jurors did not permit anyone to discuss the case with them outside of trial and that any attempt to do so would have been reported. No jury member made any such report. Therefore, we conclude that defendant has failed to establish that the jury was exposed to an extraneous influence.

## E. INEFFECTIVE ASSISTANCE

Finally, defendant argues in his Standard 4 brief that defense counsel did not provide him with effective assistance. First, he maintains that defense counsel should have questioned the jurors after they returned from the lock down drill to discern whether they had been exposed to an extraneous influence. Second, defendant submits that defense counsel should have advised him to ask that his bond be revoked in Allegan County in order to obtain additional credit for time served in Kent County for unrelated misconduct. Again, we reject defendant's arguments.

Initially, we note that defendant's claim of ineffective assistance of trial counsel is unpreserved, as he failed to move for a new trial or for an evidentiary hearing. See *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014). "Whether the defendant received the effective assistance of counsel guaranteed him under the United States and Michigan Constitutions is a mixed question of fact and law." *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). This Court reviews the trial court's findings of fact for clear error and questions of constitutional law de novo. *Id*. However, when claims of ineffective assistance of counsel are unpreserved, this Court's review is limited to errors apparent on the record. *Lopez*, 305 Mich App at 693.

Generally, in order to obtain a new trial on the grounds of ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). That is, a defendant must demonstrate that counsel's performance was "outside the wide range of professionally competent assistance" and that this deficient performance resulted in prejudice to defendant. *Strickland v Washington*, 466 US 668, 690, 692; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Further, a defendant "must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52.

First, defendant contends that defense counsel's failure to question the potential jurors about any potentially improper interaction with the prosecutor and detective during the lock down drill amounted to ineffective assistance. As detailed above, defendant has failed to demonstrate that the jury was actually exposed to an extraneous influence that may have affected the verdict as a result of the lock down drill. As such, he has failed to establish either the factual predicate for his claim or that he was actually prejudiced. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). In any event, overwhelming evidence supported the jury's verdict. Not only did CD testify regarding her sexual relationship with defendant, but DNA testing confirmed that the seminal fluids discovered in CD's underwear were a match for defendant. Accordingly, defendant cannot show that defense counsel's failure to question the jurors prejudiced the outcome of trial.

Second, defendant contends that defense counsel erred by failing to advise him to ask that his bond be revoked in Allegan County to enable him to receive credit for time he was serving in Kent County. Defendant was initially arrested for the present charges in Allegan County on February 24, 2016, and was released on bond on March 29, 2016. However, after defendant violated the conditions of a separate no-contact bond issued in Kent County regarding his contact with CD, that bond was revoked and defendant was lodged in the Kent County Jail. During the sentencing hearing in the present case, defense counsel requested sentence credit for 183 days served in Kent County. However, the trial court denied this request because defendant had not sought to revoke or set aside his bond in Allegan County.

Pursuant to MCL 769.11b, a defendant convicted of a crime is entitled to credit for time served "in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted . . . ." Our Supreme Court has held that, in enacting this statute, the Legislature sought "to give a criminal defendant a right to credit for any presentence time served 'for the offense of which he is convicted,' and not upon any other conviction." *People v Prieskorn*, 424 Mich 327, 341; 381 NW2d 646 (1985), quoting MCL 769.11b. Thus, a defendant is not entitled to sentence credit in instances when

> a defendant is released on bond following entry of charges arising from one offense and, pending disposition of those charges, is subsequently incarcerated as a result of charges arising out of an unrelated offense or circumstance and then seeks credit in the former case for that latter period of confinement.

*Id*. at 340. Subsequently, our Supreme Court reaffirmed this principle in holding that a defendant was not entitled to credit for time served for unrelated offenses committed while he was free on bond for the original offense, even when a "hold" was placed on him "by the [original] jurisdiction where he was being sentenced while he was imprisoned elsewhere . . . ." *People v Adkins*, 433 Mich 732, 739, 750-751; 449 NW2d 400 (1989).

Additionally, sentence credit is not authorized under MCL 769.11b unless a defendant serves time in jail prior to sentencing "*because of being denied or unable to furnish bond* for the offense of which he is convicted . . . ." (Emphasis added). In interpreting this language, our Supreme Court has held that "a showing that presentence confinement was the result of inability to post bond is an essential prerequisite to the award of sentence credit under the statute." *People v Whiteside*, 437 Mich 188, 196; 468 NW2d 504 (1991). The Supreme Court reasoned

that this interpretation was consistent with the statute's primary purpose of "equaliz[ing] the position of one who cannot post bond with that of a person who is financially able to do so . . . ." *Id*.

In the instant case, defendant is clearly not entitled under *Prieskorn* and *Adkins* to sentence credit for time served in Kent County for misconduct unrelated to the charges presently at issue. As stated by the trial court, defendant was incarcerated in Kent County for "additional misconduct . . . specific to contacting the victim in this case," and not for the present CSC-III charges. Moreover, defendant is incapable of demonstrating that he would have been unable to post bond in Allegan County. To the contrary, defendant had successfully posted bond on the Allegan County charges. Rather, revocation of that bond would amount to a voluntary surrender, which does not serve as a basis for sentence credit under MCL 769.11b. Because revocation of defendant's bond would not have entitled him to additional sentence credit, defendant's claim of ineffective assistance is without merit. See *People v Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003) (holding that defense counsel is "not required to make a meritless motion or a futile objection"). Therefore, in reviewing defendant's claims of ineffective assistance, we find no errors apparent on our review of the record.

Affirmed, but remanded for the ministerial task of correcting the judgment of sentence to reflect that defendant is entitled to 95 days of sentence credit for time served. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Joel P. Hoekstra
/s/ Michael F. Gadola