*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-5

ROBERT L. ARTHUR, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-18394-16)

(Hon. Truman A. Morrison, Motion Judge)
(Hon. Geoffrey Alprin, Trial Judge)

(Argued November 18, 2020                          Decided July 1, 2021)

*Bryan P. MacAvoy* for appellant.

*Chrisellen R. Kolb*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Elizabeth C. Kelley*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and FISHER, *Senior Judge*.

THOMPSON, *Associate Judge*: After a bench trial, the Superior Court convicted appellant Robert Arthur of failure to register as a sex offender from May 20, 2015, to November 9, 2016, in violation of the District of Columbia Sex

Offense Registration Act of 1999 ("SORA" or "the Act").[1] Before trial, appellant moved unsuccessfully to dismiss the charge on the ground that, as applied to him, the SORA requirements amount to retroactive punishment in violation of the *Ex Post Facto* prohibition of the U.S. Constitution. In this appeal, appellant challenges the trial court's ruling denying his motion and seeks reversal of his conviction.[2]

We conclude that the alleged punitive effects that appellant cites either (i) are features of SORA or its implementing regulations that this court has previously considered in determining that the SORA scheme is civil and remedial, rather than punitive; or (ii) have been shown at best to be effects "on [appellant as] a single individual"[3] that cannot support a determination that SORA is punitive. We therefore affirm appellant's conviction of failure to comply with SORA's registration requirements.

**I.**

---

[1] *See* D.C. Code §§ 22-4001 through 4017 (2012 Repl.).

[2] Our review is de novo. *Solomon v. United States*, 120 A.3d 618, 620 (D.C. 2015).

[3] *Seling v. Young*, 531 U.S. 250, 262 (2001).

SORA provides in pertinent part that any "person who lives, resides, works, or attends schools in the District of Columbia, and who: committed a registration offense at any time and is in custody or under supervision on or after July 11, 2000," or "[c]ommitted a registration offense at any time in another jurisdiction and, within the registration period, enters the District of Columbia to live, reside, work or attend school[]" is a "sex offender" and must register under the statute and comply with periodic verification, reporting, and other requirements as established by the Court Services and Offender Supervision Agency ("CSOSA"). D.C. Code §§ 22-4001(9)(B), (D), -4007, -4014 (2012 Repl.). "For the purposes of this requirement, a person has 'committed' a registration offense if he or she was convicted of the offense." *In re W.M.*, 851 A.2d 431, 436 (D.C. 2004); *see* D.C. Code § 22-4001(3)(A). Registrants must provide personal identifying information, including fingerprints and photographs, and must report any change of address or workplace. D.C. Code § 22-4007(a).

Individuals who have committed first or second-degree sexual abuse, assault with the intent to commit rape, or similar offenses under the law of any state are designated as "Class A" offenders, *see* 28 C.F.R. § 811, Appendix A (CSOSA regulation listing sex offender registration offenses by class) and must comply with

SORA's registration requirements on a lifetime basis. D.C. Code §§ 22-4001(6)(E) and 4002(b)(1). Lifetime registrants are required to verify their registration information on a quarterly basis. 28 C.F.R. § 811.9(a). District of Columbia regulations authorize CSOSA to adopt procedures and requirements for the verification of registration information, which may include a requirement that sex offenders "appear in person for purposes of verification" of registration information. 6A D.C.M.R. § 409.1(b); *see also* 6A D.C.M.R. § 409.2.[4] Any sex

---

[4] CSOSA regulations provide that a sex offender has the option of returning the registration information form by mail or in person unless:

> (1) The sex offender is also on probation, parole, or supervised release or otherwise must report to CSOSA, and CSOSA directs the sex offender to verify the registration information in person;

> (2) CSOSA directs the sex offender to appear in person because the sex offender has previously failed to submit a timely verification or submitted an incomplete or inaccurate verification; or

> (3) CSOSA directs the sex offender to appear in person for the purpose of taking a new photograph documenting a significant change in physical appearance or updating a photograph that is five or more years old.

28 C.F.R. § 811.9. Although generally "a sex offender shall not be eligible for relief from the registration requirements," D.C. Code § 22-4002(d), under 28 C.F.R. § 811.11(a), "[a] sex offender may be excused from strict compliance with the time limits set forth in these regulations if the sex offender notifies CSOSA in advance of circumstances that will interfere with compliance and makes alternative

(continued…)

offender who knowingly violates any requirement of the Act "shall be fined not more than [$1,000], or imprisoned for not more than 180 days, or both." D.C. Code § 22-4015(a). SORA "authorizes the Metropolitan Police Department to inform the community about [sex offenders] through various means of public notification, including posting their photographs, names, and other personal information on the Internet." *W.M.*, 851 A.2d at 434.

Appellant is subject to SORA's lifetime registration requirement, having entered a guilty plea on October 22, 1991, in the Circuit Court of Maryland for Prince George's County to one count of second-degree rape[5] and having come under supervision in the District of Columbia after July 11, 2000, and come to reside and work in the District of Columbia by 2008.[6] SORA did not become law until nearly nine years after appellant's second-degree rape conviction.[7]

---

(…continued)
arrangements to satisfy the requirements or, in the case of an emergency, notifies CSOSA as soon as the sex offender is able to do so."

[5] Appellant asserts that he entered a so-called *Alford* plea. *North Carolina v. Alford*, 400 U.S. 25 (1970). The underlying charge was that appellant and a co-defendant forcibly raped a woman while threatening to stab her with a nail file.

[6] According to the government's opposition to appellant's motion to dismiss, in 2005 appellant was under supervision in the District of Columbia (the "District") while serving a sentence for distribution of marijuana and, by sometime in 2009, was advised by CSOSA he was required to register as a sex offender in
(continued…)

It appears from the record that appellant regularly updated his registration in the District during the period from April 2012 to April 2015, receiving and signing notices from CSOSA reminding him that he was to report "in person" to CSOSA to update his registration on a quarterly basis.[8]  In May 2015, however, CSOSA reported that appellant was in violation of his sex offender registration requirements.  On November 9, 2016, Deputy Gregory Conner of the United States Marshals Service executed an arrest warrant for appellant at an apartment located at 1221 M Street N.W., where appellant's mother, Evelyn Arthur, resides. Appellant answered the door and was allowed to explain to his mother, who is hearing impaired, what the warrant was for.  According to Deputy Conner appellant explained to his mother that "it's because I didn't register[,]" "it's not their fault, it's mine. I didn't register."  Appellant Arthur then stated to his mother

---

(…continued)

the District based on his Maryland conviction.  He first registered as a sex offender in the District in April 2012, after he pled guilty to felony contempt and escape in Case No. 2011-CF1-16609.

[7] *See* D.C. Law 13-137 (July 11, 2000).

[8] At appellant's trial, a CSOSA representative testified that in-person registration typically takes 45 minutes to an hour.  The testimony does not make clear whether this time estimate also applies to in-person visits to update or verify registration information.

that "I told them I'm not going to register for something that happened over 20 years ago."

On October 12, 2018, appellant filed his Motion to Dismiss the SORA failure-to-update-registration charge. He argued that requiring him to register and maintain registration under SORA violates the *Ex Post Facto* Clause because it amounts to increased punishment for his having committed a sex offense prior to SORA's enactment. He asserted that the SORA registration requirement has a punitive effect, to wit: (1) he was terminated from his employment in 2013 when his employer learned that he was required to register as a sex offender (an allegation as to which appellant provided no documentation); (2) his mother's application for appellant to serve as her live-in aide in her public housing unit was rejected, pursuant to 24 C.F.R. § 960.204 (a)(4)[9] and 14 D.C.M.R. § 6109.6(c),[10] because appellant is subject to a lifetime sex offender registration requirement; (3)

---

[9] 24 C.F.R. § 960.204 (a)(4) is a Department of Housing and Urban Development regulation providing that a public housing authority ("PHA") "must establish standards that prohibit admission to the PHA's public housing program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program."

[10] 14 D.C.M.R. § 6109.6(c) provides in pertinent part that the District of Columbia Housing Authority "shall prohibit admission of any family that includes any individual who is subject to a lifetime registration requirement under any sex offender registration program."

CSOSA requires appellant to report in person to the Sex Offender Registration Office at least quarterly; and (4) appellant suffers humiliation from having to explain repeatedly to friends and family why the government publishes his name and photograph on the sex offender registry website. Appellant asserted that the evidence that SORA has caused him to lose housing and employment opportunities and subjects him to in-person reporting distinguishes this case from the record in *Smith v. Doe*, 538 U.S. 84 (2003) (holding that the registration requirement and notification system of the 1994 Alaska Sex Offender Registration Act did not constitute retroactive punishment prohibited by the *Ex Post Facto* Clause).

The Superior Court denied appellant's motion in a November 20, 2018, ruling. At the conclusion of the January 4, 2019, bench trial, the court found that appellant was a District of Columbia resident during the relevant period, that he "was required to register every three months" because of his status as a lifetime registrant, and that because "he did not do that [for the May 20, 2015, to November 9, 2016, period], . . . he's guilty of this offense."

**II.**

Under the *Ex Post Facto* Clauses of the Constitution, "[n]o . . . ex post facto Law shall be passed."[11] They prohibit "[r]etroactive application of a law that inflicts greater punishment than did the law that was in effect when the crime was committed." *W.M.*, 851 A.2d at 440.

As the Supreme Court explained in *Smith*, the framework for inquiry when it is claimed that a law is a forbidden ex post facto law is "well established." 538 U.S. at 92. "If the intention of the legislature [in enacting the statute] was to impose punishment, that ends the inquiry." *Id.*; that is, "[a] conclusion that the legislature intended to punish would satisfy an *ex post facto* challenge without further inquiry into its effects[.]" *Id.* at 92-93. "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the legislature's] intention to deem it civil." *Id.* at 92 (internal quotation marks omitted). And because courts "ordinarily defer to the legislature's stated intent, . . . only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (citation and internal quotation marks omitted).

---

[11] U.S. Const. art. I, § 9, cl. 3; art. I, § 10, cl. 1.

Under the Alaska law that the Supreme Court considered in *Smith*, if an individual "was convicted of an aggravated sex offense or of two or more sex offenses, he must register for life and verify the information quarterly." *Id.* at 90. The Court noted that Alaska made available on the internet the following information: the sex offender's name, aliases, address, photograph, physical description, motor vehicle information, place of employment, date of birth, crime for which convicted, date of conviction, place and court of conviction, and length and conditions of sentence, as well as a statement regarding whether the offender is in compliance with registration-update requirements or cannot be located. *Id.* at 91.

The Supreme Court observed that the Alaska legislature had expressed its objective in the text of the Alaska statute, declaring that "sex offenders pose a high risk of reoffending," identifying the purpose of the law as "protecting the public from sex offenders," and determining that "release of certain information about sex offenders to public agencies and the general public will assist in protecting the public safety." *Id.* at 93. The Court found that "nothing on the face of the statute suggests that the legislature sought to create anything other than a civil . . . scheme designed to protect the public from harm," *id.*, even though the statute's registration provisions were codified in the State's criminal procedure code, *id.* at

94. The Court found that "even if the objective of the [Alaska statute was] consistent with the purposes of the Alaska criminal justice system, the State's pursuit of it in a regulatory scheme [did] not make the objective punitive." *Id.*

The Court stated that in analyzing the effects of the Alaska statute, the most relevant factors are "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 97, 99-100. The Court reasoned that although the notification provision of the Alaska statute "resembles shaming punishments of the colonial period," *id.*, and notwithstanding the world-wide "geographic reach of the [i]nternet," stigma is not "an integral part of the objective of the regulatory scheme" and "results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." *Id.* at 97-99, 105. The Court further observed that "[i]f the disability or restraint [imposed by the regulatory scheme] is minor and indirect, its effects are unlikely to be punitive." *Id.* at 100. In concluding that the effects of the Alaska statute were not punitive, the Court reasoned that the statute's obligations were "less harsh than the sanctions of occupational debarment, which [the Court had] held to be

nonpunitive" and that the law did not "restrain activities sex offenders may pursue but leaves them free to change jobs or residences" and to do so without permission or supervision. *Id.* at 100, 101. Rejecting the reasoning that the effects of the Alaska statute were harsher than occupational debarment because the statute was likely to make registrants completely unemployable (given that "employers will not want to risk loss of business when the public learns that they have hired sex offenders"), the Court observed that "[l]andlords and employers could conduct background checks on the criminal records of prospective employees or tenants even with the Act not in force." *Id.* at 100. The Court saw in the record "no evidence that the [statute had] led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords." *Id.*

In addressing whether the Alaska statute imposed an affirmative disability, the Court observed that on its face, it did not require registrant updates to be made in person and that the record "contain[ed] no indication that an in-person appearance requirement ha[d] been imposed on any sex offender subject to the [statute]." *Id.* at 101. As to the "length of the [lifetime] reporting requirement" and the claim that it "appear[ed] to be measured by the extent of the wrongdoing, not by the extent of the risk posed," the Court was satisfied that the "broad

categories" employed by the statute[12] and "the corresponding length of the reporting requirement, [were] reasonably related to the danger of recidivism" and thus "consistent with the regulatory objective." *Id.* at 102.

The Court confirmed that a statute's "rational connection to a nonpunitive purpose" (such as public safety) is the "most significant factor in [a] determination that the statute's effects are not punitive." *Id.* at 102. It explained, however, that a statute is "not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103. The question was not, the Court emphasized, "whether the legislature . . . made the best choice possible to address the problem it s[ought] to remedy." *Id.* at 105. "Alaska could conclude," the Court said, "that a conviction for a sex offense provides evidence of substantial risk of recidivism." *Id.* at 103; *see also id.* at 103-04 (reasoning that where the regulatory restraint is a minor one such as registration and the posting of accurate information, the *Ex Post Facto* Clause does not preclude a State from dispensing with individual risk assessments and predictions of dangerousness, and making reasonable categorical judgments that, as a rule of universal application, "conviction of specified crimes should entail particular regulatory consequences").

---

[12] The Alaska statute differentiated between "individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense." *Id.* at 102.

The Court also held that "[t]he [lifetime] duration of the reporting requirements is not excessive." *Id.* at 104.

In *W.M.*, this court applied *Smith* in determining whether SORA is punitive and whether its retroactive application therefore violates the *Ex Post Facto* Clause. *See* 851 A.2d at 440. We found it "clear and unequivocal" from the legislative history of SORA that the Council intended the SORA registration and notification requirements as "regulatory measures adopted for public safety purposes" rather than criminal punishment. *Id.* at 441. We concluded that "[t]he material registration and notification provisions of SORA . . . are comparable if not identical to . . . those of Alaska" and that *Smith* had settled the ex post facto issues presented: SORA does not inflict punishment. *Id.* at 435, 446.

**III.**

Appellant does not ask us to overturn SORA, but instead to determine "that SORA violates the Ex Post Facto Clause as applied to [him]." At the same time, he argues that SORA is based on a flawed premise about the risk of recidivism, is excessive with respect to its stated purpose, and fails to serve any nonpunitive

purpose. Thus, notwithstanding the label appellant uses to describe his argument, he at least arguably is asserting a facial challenge to SORA as well as an as-applied challenge. *See Doe v. Reed*, 561 U.S. 186, 194 (2010) ("The label [a party gives to his challenge] is not what matters.").[13]

For its part, the government emphasizes in its brief that this division of the court is bound by *W.M.*[14] Further, relying on *Seling*, 531 U.S. 250, the government urged at oral argument that because this court has already held in *W.M.* that SORA is not punitive, appellant's as-applied challenge is foreclosed.

---

[13] One court has aptly observed that "a claim can have characteristics of as-applied and facial challenges: it can challenge more than just [a party's] particular case without seeking to strike the law in all its applications." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015). And indeed the Supreme Court has instructed that "the distinction between facial and as-applied challenges is not so well defined . . . that it must always control the . . . disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). The Court has also recognized that "facial challenges and as-applied challenges can overlap conceptually." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (quoting *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012), and citing Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1336 (2000) ("Facial challenges are not sharply categorically distinct from as-applied challenges to the validity of statutes.").

[14] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court.").

There can be found in a number of court decisions language suggesting, incorrectly we think, that *Seling* established that "ex post facto challenges cannot be brought on an as-applied basis." *People v. Tucker*, 879 N.W.2d 906, 911 n.4 (Mich. Ct. App. 2015).[15] A more precise description of the holding of *Seling* is that the Supreme Court "rejected the argument that a statute can be declared punitive 'as applied' to a particular person when the highest State court has already definitively construed the statute as civil." *In re Dutil*, 768 N.E.2d 1055, 1065 (Mass. 2002).[16] That is precisely the situation presented here; that is, this court,

---

[15] *See also, e.g.*, *Doe v. Biang*, 494 F. Supp. 2d 880, 887 n.7 (N.D. Ill. 2006) (*Seling* "held that a plaintiff cannot mount an as-applied ex post facto challenge."). *But see Garner v. Jones*, 529 U.S. 244, 255 (2000) ("In the [Ex Post Facto Clause] case before us, respondent must show that as applied to his own sentence[,] the [change in] law created a significant risk of increasing his punishment.").

[16] In *Seling*, the Supreme Court reversed a Ninth Circuit determination that a habeas petitioner could challenge a Washington State statute authorizing the civil commitment of sexually violent predators on the ground that it was punitive "as applied" to him, in violation of the *Ex Post Facto* Clause. 531 U.S. at 253-254, 266. As the U.S. Supreme Court explained, the Washington Supreme Court had already held that the statute was not punitive, but the Ninth Circuit "reasoned that actual conditions of [Seling's] confinement could divest a facially valid statute of its civil label upon a showing by the clearest proof that the statutory scheme is punitive in effect." *Id.* at 259 (citing 192 F.3d at 874). The U.S. Supreme Court rejected that reasoning; to hold otherwise, the Court said, would be to permit "an end run around the [State] Supreme Court's decision that the [statute] [was] civil" even though no direct attack on the Washington court's decision had been advanced. *Id.* at 263-64. It was in that context that the Court held that the habeas petitioner could not "obtain release through an 'as-applied' challenge to the Washington Act on . . . *ex post facto* grounds." *Id.* at 263. The Court reasoned that an as-applied analysis that is dependent on the day-to-day "vagaries in the

(continued…)

the highest court of the District of Columbia, has already definitively construed SORA as civil. Accordingly, we may not re-evaluate SORA's civil nature by reference to the effect that it has on appellant as "a single individual." *Seling*, 531 U.S. at 262.

With this background, we proceed to consider appellant's (seemingly) facial and as-applied challenges. Insofar as appellant asks us to revisit our conclusion in *W.M.* that the facial features of the SORA scheme that he decries are so punitive as to negate the Council's remedial intent, we can agree that any record evidence about SORA's "necessary operation" different from the features that were before us in *W.M.*, or any amendments to SORA or its implementing regulations since *W.M.* was decided, could warrant revisiting our conclusion there.[17] *Cf. State v. Williams*, 952 N.E.2d 1108, 1112 (Ohio 2011) (considering claimed punitive

_____

(…continued)

implementation" of confinement, which "extends over time under conditions that are subject to change," "would prove unworkable" because it "would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the . . . *Ex Post Facto* Clause[]." *Id.* *Seling* confirmed the Supreme Court's "express[] disapprov[al] of evaluating the civil nature of an Act by reference to the effect that Act has on a single individual." *Id.* at 262 (citing *Hudson v. United States*, 522 U.S. 93 (1997)).

[17] Appellant does not challenge our conclusion in *W.M.* that the Council intended SORA to be remedial civil legislation.

effects of sex-offender registration law because "[t]he statutory scheme ha[d] changed dramatically" and "markedly" since the court earlier found that the registration process "imposed . . . an inconvenience 'comparable to renewing a driver's license'"); *Doe v. DA*, 932 A.2d 552, 560-63 (Me. 2007) (remanding ex post facto challenge for further development of the record on the effects of the State's sex-offender registration law, because the law had been amended, and had become more restrictive, after an earlier State Supreme Court decision holding that it did not violate the Ex Post Facto Clause). But we are satisfied that neither circumstance obtains here. Since *W.M.* was decided, neither SORA nor its implementing regulations have been amended to add any of the requirements appellant complains of in this appeal.

Rather, the features of the SORA registration and notification scheme about which appellant complains are ones that we already considered in *W.M.* Appellant asserts that SORA's notification system is no longer passive; he highlights that private companies now send out sex offender alerts via email to individuals who may never have requested to receive that information. But in holding that SORA is not punitive and that its application to persons who committed sex offenses before it was enacted does not offend the *Ex Post Facto* Clause, 851 A.2d at 435-36, 446, *W.M.* recognized that SORA authorizes both passive and active notification to the

public, *id.* at 437.[18]  We explained that we "do not ignore SORA's active notification provisions, but as with the provisions allowing CSOSA to require in-person interviews, . . . we do not assume that they will be abused[.]"  *Id.* at 446 n.19.  In addition, we recognized in *W.M.* that SORA "imposes registration requirements on sex offenders based on the nature of the offenses they committed rather than on an individualized assessment of their risk of recidivism,"[19] *id.* at

---

[18] We explained that active notification entails "affirmatively informing persons or entities about sex offenders by any authorized means, including community meetings, flyers, telephone calls, door-to-door contacts, electronic notification, direct mailings, and media releases," while "[p]assive notification" entails "making information about sex offenders available for public inspection or in response to inquiries" through, e.g., "Internet postings, making registration lists and information about registrants available for inspection at police stations and other locations, and responding to written or oral inquiries."  *Id.* at 437-38 (internal quotation marks omitted) (citing D.C. Code § 22-4011(b)(1)(A), (B)).

[19] Appellant cites statistics about the low recidivism rate of sex offenders, but relies on Department of Justice reports from 2003 that analyze data from earlier years.  These reports were already extant when we held in *W.M.* that the rationale of *Smith* — that "a state reasonably 'could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism' that is sufficient without more to justify a regulatory response" — "applies with undiminished force" to SORA.  *W.M.*, 851 A.2d at 445-46.

We note further that the Superior Court record shows that in 2011 appellant was charged in the District with assault with intent to commit first-degree sex abuse (but accepted a plea offer under which he was allowed to plead guilty to felony contempt and escape).  While we afford appellant the presumption of innocence as to the 2011 charge, the fact that his 1991 second-degree rape conviction was followed by his being charged in 2011 with assault with intent to commit first-degree sex abuse, prevents him from showing by the "clearest proof"

(continued…)

436; that "SORA allows CSOSA to compel registrants to appear in person for verifications and periodic updates; and that CSOSA has exercised this discretionary authority," *id.* at 444 n.16.[20]

These determinations made in *W.M.* answer appellant's claims about the facially "punitive" effects of the SORA statute and implementing regulations. We therefore are bound by *W.M.*'s conclusion that notwithstanding "cogent" objections to SORA's effects "as stigmatizing, onerous, and unfair to former offenders who have rehabilitated themselves," the "'clearest proof' hurdle" is not surmounted, *id.* at 443 — i.e., those effects neither "negate [the Council's] intention to establish a civil regulatory scheme" nor transform SORA's civil remedies into criminal penalties. *Id.* at 444.

---

(…continued)
that the Council's concern about the risk of recidivism is unwarranted and that the SORA registration appellant commenced in 2012 is excessive.

[20] We reasoned that "occasional in-person meetings may be necessary to effectuate SORA's goals - for instance, in order to update a registrant's photograph - and in our view they need not be so onerous in a jurisdiction the size of the District of Columbia as to amount to a significant affirmative disability." *Id.* We said that "[t]he speculative possibility, unsupported by the record before us, that CSOSA might abuse its discretion and impose an excessive personal appearance schedule does not persuade us that SORA 'in its necessary operation' subjects registrants to an affirmative disability or restraint." *Id.*

Appellant argues that the requirement, imposed by CSOSA in implementing SORA, that he and other registrants report to the sex offender registry office in person to provide quarterly verification information is "still an open point" not considered in *W.M.* To the extent appellant intends this as a facial challenge to SORA, he must satisfy the standard for a facial challenge: i.e., he must show that the in-person verification requirement is punitive and excessive "in all its applications." *Tilley v. United States*, 238 A.3d 961, 969 (D.C. 2020). We are unpersuaded that the in-person verification requirement meets that standard. The circumstances described in 28 C.F.R. § 811.9, addressing when CSOSA is explicitly authorized to impose an in-person requirement, include circumstances (such as when the registrant has previously failed to submit a timely or accurate verification) in which a requirement of periodic in-person check-ins would seem to serve a non-punitive purpose. *Cf. United States v. Parks*, 698 F.3d 1, 6 (1st Cir. 2012) (explaining that in-person verification establishes that the sex offender is still "in the vicinity and not in some other jurisdiction where he may not have registered"). Appellant has not shown that even as applied to him, the in-person verification requirement is excessive (and thus, *a fortiori*, he has not shown that it is excessive in all its applications). The record shows that in 2009, appellant was convicted in Maryland of failure to register under that State's sex offender registration law, that he was residing in the District of Columbia by 2008 but failed

to register under SORA even after being advised by CSOSA that he was required to do so, and that he had a history as a "difficult to deal with" registrant and of balking at having to register in both the District and Maryland and asserting that he would not register despite what the laws required.[21]  Further, appellant makes no claim that he sought a relaxation of the time limits of the quarterly in-person reporting requirement and was denied.  *See* 28 C.F.R. § 811.11 (authorizing CSOSA to excuse a registrant "from strict compliance with the time limits set forth in these regulations").  For all these reasons, we have not been presented with the "clearest proof" that CSOSA's authority to require in-person verification renders SORA a facially punitive scheme or that CSOSA has abused its authority.[22]

---

[21] *Cf. State v. Gaskill*, 817 N.W.2d 754, 758 (reasoning that even if requirement that a sex offender report his change to transient status within 3 working days after he no longer had a residence was too stringent as applied to other registrants who were unable to comply or whose compliance was interfered with, Gaskill did not report his change until nearly 30 days after he was required to do so, and thus did not demonstrate facts showing that the effect of the law was punitive as applied to him), *rev'd on other grounds*, 824 N.W.2d 655 (Neb. 2012).

[22] We note in addition that the Superior Court record in Case No. 2011-CF1-16609 shows that through October 2013, appellant was on CSOSA-supervised probation following his convictions of felony contempt and escape.  Thus, to the extent that appellant's need to report to CSOSA in person affected his employment (the record shows that he was still employed as of April 2013), it is not clear that it was in-person visits for SORA verification, rather than in-person visits in connection with appellant's supervised probation, that were problematic for him.

At oral argument, counsel for the government seemed to concede that even after a decision by the highest court of a jurisdiction that a statute is civil, an as-applied ex post facto challenge might lie if the punitive effects are alleged to burden a broad class of sex-offenders. Appellant suggests that this is the circumstance here; he urges us to consider the "housing and employment restraints" he cites, much as the Sixth Circuit did before concluding that the Michigan sex offender registration statute "imposes punishment." *See Does 1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016).

Neither the government's concession nor *Snyder* helps appellant's cause.[23] One of the effects of the Michigan statute that the Sixth Circuit graphically described (with the aid of a map of the extensive areas of Grand Rapids, Michigan that the law rendered off-limits to sex offenders) is that Michigan's law so restricted where sex offenders may live, work, and loiter that "many of the [p]laintiffs have had trouble finding a home in which they can legally live or a job

---

[23] We note that *Snyder* was in a posture different from the posture of this case: in resolving the challenge to the Michigan sex offender registration statute, the Sixth Circuit was writing on a clean slate, so to speak; it did not reference, and we are not aware of, a prior decision of the Michigan Supreme Court that determined that the law was a civil statute.

where they can legally work."[24]   834 F.3d at 698, 702.   Appellant has not documented any such broad impact with respect to the effects of SORA that he emphasizes: his own job loss and his disqualification as a live-in aide for his mother, who lives in public housing.

As to appellant's asserted job loss, we begin by observing that appellant has not presented data about the impact of SORA on employment prospects for SORA registrants generally or for a broad category of registrants, and — not having documented the reason for his termination from his job — has not shown that his employer (which apparently was Miller & Long Construction at the time appellant lost his job in 2013) had a general policy of not employing SORA registrants or lifetime registrants.  We appreciate that appellant did not have an evidentiary hearing on his motion to dismiss the failure-to-register charge, but our point is that his proffered evidence regarding his job loss purportedly because of the SORA registration requirement is, even now, a mere assertion by counsel, unaccompanied by an affidavit, declaration, or documentary evidence suggestive of a broadly applicable policy.  As we noted in *W.M.*, consequences for a sex offender may

---

[24] By contrast, and as we noted in *W.M.*, under SORA, registrants are not prevented, for example, from residing, working, attending school, or traveling "wherever, whenever and with whomever they wish."  851 A.2d at 450.

flow "'not from [SORA's] registration and dissemination provisions, but from the fact of conviction, already a matter of public record.'" 851 A.2d at 444 n.15; *see also Smith*, 538 U.S. at 89 (noting that the record contained no evidence that the Alaska statute "ha[d] led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred"). Without documentation that appellant and many others have faced job termination based on SORA's lifetime or other registration requirements rather than on their underlying convictions as sex offenders, appellant has not put before us the "clearest proof" of punitive effects that would be required to afford him relief on his ex post facto claim. *Seling*, 531 U.S. at 261.

Likewise with respect to the evidence appellant has presented about his disqualification to reside in his ailing mother's public housing unit to assist her as a live-in aide. We acknowledge that this is a serious and regrettable restraint, but it is "only one incident," *Smith*, 538 U.S. at 100, i.e., the type of idiosyncratic effect that cannot support a claim that SORA is punitive. *See Seling*, 531 U.S. at 262 (instructing that a court may not "[re]evaluat[e] the civil nature of an Act by referenc[ing] . . . the effect that [it] has on a single individual"); *State v. Letalien*, 985 A.2d 4, 17 (Me. 2009) ("The ex post facto prohibition is intended to act as a check on the exercise of legislative authority as it affects broad categories of

persons, and is not intended to create an individual right to challenge a retroactive law based on the effect that the law has on each person's individual circumstances."); *McGuire v. Strange,* 83 F. Supp. 3d 1231, 1250 (M.D. Ala. 2015) ("[I]diosyncratic effects cannot be used alone in upholding [an ex post facto] challenge."). In other words, we may not decide this case based on how SORA's requirements have affected appellant in his particular circumstances involving his mother. As to the more general restraint that appellant's experience might be deemed to represent — appellant's exclusion from public housing because he is a lifetime SORA registrant — "[t]he touchstone of [our] inquiry," *Peugh v. United States*, 569 U.S. 530, 539 (2013), is whether appellant's lifetime registration obligation creates "a significant risk of increasing his punishment [for his underlying sex offense]," *Garner*, 529 U.S. at 255. Appellant has not shown that lifetime registrants face a significantly increased risk of being unable to live in public housing, i.e., a risk that otherwise would not exist. Suffice it to say that the opportunity to live in public housing is severely limited even without SORA implications; according to the District of Columbia Housing Authority website, as of April 2020, the waitlist for public housing in the District was closed to new applicants with no scheduled time to reopen.

https://webserver1.dchousing.org/?page_id=284#waitlist    https://perma.cc/988V-GF2A .[25]

## IV.

None of appellant's claims warrants revisiting *W.M.* or enables appellant to overcome this court's determination in that case that SORA is not punitive. Wherefore appellant's failure-to-register conviction is

*Affirmed.*

---

[25] Moreover, the public-housing stock in the District of Columbia is a small fraction of the private housing stock. *See* Yesim Sayin Taylor, *Taking Stock of the District's Housing Stock: Capacity, Affordability, and Pressures on Family Housing*, D.C. POL'Y CTR., (Mar. 27, 2018) https://www.dcpolicycenter.org/publications/taking-stock https://perma.cc/WX4G-BAVP .