*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DAVID CHRISTOPHER MORALES,

      Defendant-Appellant.

UNPUBLISHED
September 26, 2024
1:41 PM

No. 363236
Ingham Circuit Court
LC No. 20-000095-FC

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Following a jury trial, defendant was found guilty of three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a); MCL 750.520c(2)(b) (sexual contact with victim under 13 years of age by defendant 17 years of age or older). Defendant admitted in text messages to engaging in repeated sexual acts with the victim, his 11-year-old daughter SM. However, he claimed it was all her doing. The trial court sentenced defendant to concurrent terms of 75 to 180 months' imprisonment for each conviction. He was also sentenced to lifetime registration under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, and lifetime electronic monitoring, MCL 750.520n(1). Defendant appeals by right and challenges only certain portions of his sentence, arguing that his sentence violates his constitutional rights: against (1) application of an ex post facto law and (2) cruel or unusual punishment, and (3) to be free from unreasonable searches. We affirm.

## I. FACTS

There was a documented history of defendant's "neglect and abuse" of SM, which included hitting her with a belt and driving drunk and crashing while she was a passenger. Defendant was separated from SM's mother, and on weekends SM and her brother would visit defendant. Starting in 2018, "almost every single weekend," defendant would sexually assault SM. At the time defendant was 43 years old, and SM was 11 years old. In order to accomplish these crimes, defendant would arrange for his son to leave him alone with SM. Once alone, he would give instructions to SM, threatening that she would get into trouble if she did not adhere to them.

Defendant assaulted SM in a variety of ways, including placing his fingers deeply inside of her vagina, making SM touch his penis until he ejaculated, and on one occasion, forcing his penis into her vagina. On some occasions SM would cry or ask defendant to stop, but he would continue the assault. The last assault occurred on August 18, 2019. SM reported the assaults to her friend, who reported it to Child Protective Services. Defendant fled the state, before ultimately being found and extradited back to Michigan. In text messages to SM's mother, defendant admitted to the sexual contact, but attempted to cast SM as the initiator. He claimed that she "manipulated" and "bribed him" into committing the acts. After the crimes, SM experienced post-traumatic stress disorder (PTSD), anxiety, and nightmares.

The prosecution charged defendant with two counts of CSC-I, MCL 750.520b(1)(a); MCL 750.520b(2)(b) (sexual penetration of victim under 13 years of age by defendant 17 years of age or older), and three counts of CSC-II. The jury was hung, and a mistrial declared, as to the CSC-I counts. Defendant was found guilty of the CSC-II charges, and sentenced as previously stated.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Plaintiff argues that defendant did not preserve any of the issues raised in this appeal because they were not raised at the sentencing hearing. Generally, issues raised, addressed, or decided in the trial court are preserved for appellate review. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). The issues were not raised at sentencing, but were raised in a motion to correct an invalid sentence, and are therefore preserved. See *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018). We review constitutional issues de novo. *People v Betts*, 507 Mich 527, 541 n 11; 968 NW2d 497 (2021).

### B. EX POST FACTO

First, defendant argues that the 2021 amendments to the SORA were, as applied to him, an unconstitutional ex post facto punishment.

Both the United States and Michigan Constitutions bar the enactment of an ex post facto law. US Const, art I, § 10; Const 1963, art 1, § 10. "The Ex Post Facto Clauses of the United States and Michigan Constitutions bar the retroactive application of a law if the law: (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence." *People v Earl*, 495 Mich 33, 37; 845 NW2d 721 (2014). "At issue here is the third type of a violation of ex post facto provisions, i.e., when a law allegedly increases the punishment for a crime." *People v Neilly*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165185); slip op at 6.

Michigan's SORA was passed in 1994, and went into effect in 1995. 1994 PA 295. Several amendments to the SORA have since been enacted into law, with 2011 PA 17 and 2012 PA 372 being two of the more recent amendments in effect at the time defendant committed these crimes. The 2021 amendments to the SORA, contained in 2020 PA 295, were enacted into law on December 29, 2020, and went into effect March 24, 2021, after these crimes were committed.

In *Betts*, 507 Mich at 562, the Supreme Court ruled that the 2011 version of SORA imposed a punishment, and was not a mere civil regulation. Therefore, it was subject to the bar on ex post facto punishments. *Id.* Consequently, a defendant sentenced for CSC-II in 1993 could not be convicted for failure to follow reporting requirements *introduced* in the 2011 SORA amendments. *Id.* at 574. In *People v Lymon*, 342 Mich App 46, 80-81; 993 NW2d 24 (2022), aff'd in part and vacated in part by *People v Lymon*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 164685), this Court concluded (and the Supreme Court affirmed) that, notwithstanding that the 2021 version of SORA was less burdensome on offenders than the 2011 version, the 2021 SORA still imposed a punishment as to non-sex offenders, and was not a civil regulation.

Defendant asserts that the 2021 SORA imposes a criminal punishment, and plaintiff does not contest that assertion. See *Betts*, 507 Mich at 549-562; *Lymon*, ___ Mich at ___; slip op at 30 (concluding that the 2021 SORA is punishment as to non-sex offenders). We will assume for purposes of argument that it is a punishment when it comes to sex offenders like defendant. But, even if it is, defendant does not identify *which* of the 2021 SORA amendments he is attempting to avoid. Without identification of any specific change between the 2011 SORA and the 2021 SORA, there would be no ex post facto problem: registration under the 2021 SORA merely reiterated restrictions that were already on the books in 2018 and 2019, when defendant committed his crimes. As far as we can discern, none of the issues defendant raises concerning his sentence were new conditions introduced in the 2021 amendments to the SORA. And, it is the responsibility of defendant to identify such a condition if he wishes to properly contest it as an ex post facto violation. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Defendant's registration under the 2021 SORA did not result in an ex post facto violation.

## C. LIFETIME SORA REGISTRATION

Next, defendant argues that lifetime SORA registration, with no separate individual risk assessment, is cruel or unusual punishment in violation of the Michigan Constitution.

Defendant's convictions classify him as a tier III sex offender. MCL 28.722(v)(*v*). There is no separate risk assessment procedure needed to give him this classification, or to maintain it. Because none of the limited options for discontinuing registration apply to him, he must stay registered for life. MCL 28.728c(2) and (3). Defendant must promptly report changes to his information, such as residence or employment, and must report four times a year for verification of his information. MCL 28.725(1) and (2); MCL 28.725a(3)-(5). Information that identifies him, and publishes his sex offender status, is maintained on a sex offender website available to the public. MCL 28.728(2).

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII. If a punishment 'passes muster under the state constitution, then it necessarily passes muster under the federal constitution.'" *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011), quoting *People v Nunez*, 242 Mich App 610, 618-619 n 2; 619 NW2d 550 (2000). When compared to the federal standard, Michigan applies a "heightened protective standard": "in addition to those protections guaranteed to every citizen of this country under the Eighth Amendment of the federal Constitution, our state Constitution has historically afforded greater bulwarks against barbaric and inhumane punishments." *People v Parks*, 510 Mich 225, 243; 987 NW2d 161 (2022).

The Michigan Constitution includes "a prohibition on grossly disproportionate sentences." *Benton*, 294 Mich App at 204. "[T]he issue under Const 1963, art 1, § 16 . . . concerns whether the punishment concededly chosen or authorized by the Legislature is so grossly disproportionate as to be unconstitutionally 'cruel or unusual.' " *People v Bullock*, 440 Mich 15, 34-35 n 17; 485 NW2d 866 (1992). Michigan courts consider a four-factor balancing test when evaluating whether a punishment is unconstitutionally cruel or unusual: "(1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation." *Parks*, 510 Mich at 242. "Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). "A proportionate sentence is not a cruel or unusual punishment." *People v Malone*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 331903); slip op at 6.

"A party challenging the constitutionality of a statute has the burden of proving its invalidity." *People v Jarrell*, 344 Mich App 464, 482; 1 NW3d 359 (2022). When addressing this issue, we must remain mindful of several important principles of judicial review. First, all courts must exercise great caution before utilizing the judicial power to declare a law unconstitutional. *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 570; 566 NW2d 208 (1997). Second, out of separation of powers concerns, see Const 1963, art 3, § 2, we presume that a statute is constitutional, *In re Harrand*, 254 Mich 584, 589; 236 NW 869 (1931), and therefore the party challenging the constitutional validity of the law bears a heavy burden, *Houdek v Centerville Twp*, 276 Mich App 568, 573; 741 NW2d 587 (2007).

Our caselaw, as well as that from the United States Supreme Court, establishes that lifetime SORA registration, with no additional risk assessment other than what is gauged by statute, is not cruel or unusual for a CSC-II offender, even one that was a juvenile when he committed the crime. In *Malone*, ___ Mich App at ___; slip op at 2-3, the defendant pleaded guilty to CSC-II. He had been 16 years old at the time of the crime and was "cognitively and emotionally impaired," with his victim being 14 months old. *Id*. at 1-2. The defendant was first sentenced as a juvenile to a treatment facility, with his sentence including lifetime registration under the SORA. *Id*. at 3. After concerning behavior at the juvenile facility, he was resentenced as an adult to a term of imprisonment. *Id*. at 3-4. He was also sentenced to lifetime SORA registration, and he appealed, arguing that this was facially cruel or unusual punishment "for juvenile offenders, even when convicted and sentenced as adults." *Id*. at 4. This Court determined that such a procedure was not cruel or unusual punishment. *Id*. at 8.

In *Jarrell*, 344 Mich App at 473, after the defendant was convicted of two counts of CSC-I, he challenged the imposition of lifetime SORA registration as cruel or unusual punishment as applied to him, *id*. at 481. The Court engaged in the four-part cruel or unusual punishment analysis, holding that the first "three factors strongly support that such a punishment is neither cruel nor unusual as applied to [the defendant's] CSC-I convictions." *Id*. at 486-487. The Court concluded that the fourth factor did point in the defendant's favor, but held that the first three factors were still enough to outweigh the fourth, holding that a lifetime SORA registration requirement was not cruel or unusual. *Id*.

Both *Malone* and *Jarrell*, but particularly *Malone* as it involved CSC-II, make defendant's argument difficult to accept. In addition to that precedent are the details of defendant's crime,

which we must also consider for purposes of his as-applied challenge. Those facts do nothing to clear him from this precedent. The only positive characteristic he identifies with respect to his risk level is that he did not have a sex offense conviction prior to these. Defendant was 43 when he committed these crimes, and his offense was undeniably grave. One conviction under MCL 750.520c(1)(a) would have subjected defendant to this punishment, MCL 28.722(v)(*v*), yet defendant was convicted of three counts of CSC-II. More to the point, SM's description of defendant's conduct revealed widespread and lasting abuse: assaults occurring every weekend for a year, easily eclipsing the circumstances encompassing the three convictions. SM was 11 to 12 years old, was defendant's daughter, and stayed with him on weekends in what should have been a caretaking role for him.[1] SM detailed telling defendant to stop, and crying, but on both occasions, defendant assaulted her anyway. Defendant planned out and had a system for committing these assaults without his son finding out. And when SM reported defendant, he attempted to flee and blamed SM for the assaults. Under these facts and circumstances, coupled with the law recounted above, defendant has not established that the lifetime registration, as applied to him, constitutes constitutionally cruel or unusual punishment.

We also reject defendant's argument that, in the absence of an individualized risk assessment, the lifetime registration requirement violates Const 1963, art 1, § 16. Defendant's classification as a tier III offender who committed a serious sex crime against someone under the age of 13, MCL 28.722(v)(*v*), already took into consideration the significant circumstances of the crime and defendant's risk level. The Legislature is constitutionally permitted to enact punishments that are tailored to particular crimes (sexual assaults) committed by particular individuals (those over 17) against particular victims (those under 13). In other words, the Legislature did take into consideration the age of the defendant and the victim, and the seriousness of the crime committed, when determining the appropriate restrictions. That, according to the Supreme Court in *Smith v Doe*, 538 US 84, 103-104; 123 S Ct 1140; 155 L Ed 2d 164 (2003), is enough of an "individualized" determination to pass constitutional muster:

> The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. We have upheld against *ex post facto* challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment. As stated in *Hawker* [*v New York*, 170 US 189, 197; 18 S Ct 573; 42 L Ed 1002 (1898)]: "Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application . . . ." The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of

---

[1] Our Supreme Court has recently and repeatedly cited to certain studies opining that "adolescent" criminal defendants 18 years of age and younger have developing brains, so cannot constitutionally be held accountable or punished in the same manner as their adult counterparts. See e.g., *Parks*, 510 Mich at 248. Here, at 11, the victim was not even an adolescent, and the perpetrator was her father, leaving her virtually helpless to defend against the assaults.

their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause.  [Citations omitted.]

Additionally, if defendant had been convicted on his CSC-I charges, he would have received a mandatory minimum sentence of 25 years and faced up to life imprisonment.  MCL 750.520b(2)(b).  These punishments are a perfect comparison of other Michigan sentences, and show that lifetime SORA registration is not cruel or unusual when compared to lifetime in prison. Each of our sister states, the District of Columbia, and the federal system all have sex offender registration systems that include mandatory lifetime registration for at least some offenders. Collateral Consequences Resource Center, *50-State Comparison: Relief from Sex Offense Registration Obligations* <https://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex offender-registration-obligations/> (accessed June 18, 2024).  "Many states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault." *Jarrell*, 344 Mich App at 486.

Defendant is correct that prior courts have noted that SORA obligations do not appear to advance the offender's rehabilitation.  *Id*. at 486; *Malone*, ___ Mich App at ___; slip op at 8.  But this one factor favorable to him is far outweighed by the other three factors.  See *Jarrell*, 344 Mich App at 486; *Malone*, ___ Mich App at ___; slip op at 8.  As applied to defendant, lifetime SORA registration, with no separate individualized risk assessment, was not unconstitutionally cruel or unusual punishment.

## D.  LIFETIME ELECTRONIC MONITORING

Finally, defendant argues that lifetime electronic monitoring, again imposed with no separate risk assessment, is both a cruel or unusual punishment and an unreasonable search.

MCL 750.520c(2) provides:

> Criminal sexual conduct in the second degree is a felony punishable as follows:
>
> (a) By imprisonment for not more than 15 years.
>
> (b) In addition to the penalty specified in subdivision (a), the court shall sentence the defendant to lifetime electronic monitoring under section 520n if the violation involved sexual contact committed by an individual 17 years of age or older against an individual less than 13 years of age.

The monitoring takes the form of "a device by which, through global positioning system satellite or other means, an individual's movement and location are tracked and recorded."  MCL 791.285(3).  Movement and location are able to be determined "both in real time and recorded time."  MCL 791.285(1)(b).  The individual must "wear or otherwise carry" the device, and pay $60 a month to reimburse the cost of the device.  MCL 791.285(2).

Keeping in mind the constitutional standards previously discussed, we also recognize that "[t]he right against unreasonable searches and seizures is guaranteed by both the state and federal

constitutions. US Const, Am IV; Const 1963, art 1, § 11. The state constitutional standard is not higher than the federal standard." *People v Jordan*, 187 Mich App 582, 586; 468 NW2d 294 (1991). "Reasonableness depends upon the facts and circumstances of each case." *Id*. "The applicable test in determining the reasonableness of an intrusion is to balance the need to search, in the public interest, for evidence of criminal activity against invasion of the individual's privacy." *Id*.

In *People v Hallak*, 310 Mich App 555, 569; 873 NW2d 811 (2015), rev'd on other grounds 499 Mich 879 (2016),[2] the defendant brought both facial and as-applied cruel or unusual punishment claims with respect to lifetime electronic monitoring. The defendant had been convicted of one count of CSC-II based upon improperly touching a 12-year-old victim, in addition to one count of CSC-III and six counts of CSC-IV related to other victims. *Id*. at 560. He was sentenced to lifetime electronic monitoring with respect to the CSC-II conviction. *Id*. at 563. The Court determined that this was not a cruel or unusual punishment, facially or as applied. *Id*. at 577. In doing so, it described how a monitoring system allows law enforcement to ensure an offender is not in a prohibited location, and how it also acts as a deterrent. *Id*. at 574. The Court pointed to "the ancillary societal benefit of this lifelong monitoring: to ensure that certain sex offenders will not again be in a position to exploit their potential victims—children, some of the most vulnerable individuals in our society." *Id*. at 575.

> The high recidivism rate and vulnerability of the victims are the common elements that allow for lifetime electronic monitoring in CSC-II cases involving minor children, which distinguishes these crimes from those defendant highlights. In other words, the factors that would allow for the most pertinent comparison—a minor victim under the age of 13 with an offender 17 or older—are missing from these other crimes. [*Id*.]

The Court cited 10 states other than Michigan that "mandated lifetime monitoring for defendants convicted of the most serious CSC offenses or CSC with a minor." *Id*. The defendant argued "that this is the case only for more serious sexual offenses," and we responded that "sexual offenses involving children under 13 years of age are grave offenses and, given the judicially recognized recidivism rate for these offenders, this level of protection is not clearly excessive or grossly disproportionate. It is certainly not unusual." *Id*. at 576.

Finally, the defendant argued that lifetime electronic monitoring violated the Fourth Amendment of the United States Constitution. *Id*. at 577-578. The Court ruled that the electronic monitoring was a search, but not an unreasonable one "for a defendant 17 years or older convicted of CSC-II involving a minor under 13." *Id*. at 579. Recognizing that "the Legislature was seeking to provide a way in which to both punish and deter convicted child sex offenders and to protect society from a group known well for a high recidivism rate," the Court concluded that "when enacting this monitoring system and requiring it only for those 17 or older who commit CSC against children under the age of 13, the Legislature was addressing punishment, deterrence, and

---

[2] The Supreme Court remanded only to allow the trial court to reconsider if it would have imposed a different sentence in light of the change in sentencing constraints brought by *People v Lockridge*, 498 Mich 358, 364-365; 870 NW2d 502 (2015).

the protection of some of the most vulnerable in our society against some of the worst crimes known." *Id*. at 580. The Court stated that "parolees and probationers have a lower expectation of privacy, even in the comfort of their own homes, than does the average law-abiding citizen." *Id*. at 581. "The monitoring does not prohibit defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes. Instead, the monitoring device simply records where he has traveled to ensure that he is complying with the terms of his probation and state law." *Id*. "And although this monitoring lasts a lifetime, the Legislature presumably provided shorter prison sentences for these CSC-II convictions because of the availability of lifetime monitoring." *Id*. Noting "that minor victims of CSC-II are often harmed for life," the Court recognized that "[t]hough it may certainly be that such monitoring of a law abiding citizen would be unreasonable, on balance the strong public interest in the benefit of monitoring those convicted of CSC-II against a child under the age of 13 outweighs any minimal impact on defendant's reduced privacy interest." *Id*. at 581.

As defendant recognizes, *Hallak* is binding with respect to both of the constitutional issues he raises concerning his lifetime electronic monitoring. To avoid application of *Hallak*, defendant argues that more recent research on sex offender recidivism, described in *Betts*, 507 Mich at 560-562, justifies disregarding or reversing *Hallak*. In other words, according to defendant, *Hallak*'s reference to the high recidivism rate for sex offenders—which was itself based in part on United States Supreme Court decisions[3]—is outdated in light of new studies on the subject. *Hallak*, of course, is binding under MCR 7.215(J)(1), and as outlined below, there are a plethora of reasons why we cannot accept defendant's arguments. Thus, we reaffirm *Hallak*.

First, the Court in *Hallak*, 310 Mich App at 573-576, supported its decision with several points that research on recidivism does not contradict: a monitoring system allows law enforcement to ensure an offender is not in a prohibited location, acts as a deterrent, protects children (a particularly vulnerable victim class), and assists the defendant with rehabilitation. Throughout the opinion the Court made these points clear:

> To combat these substantial recidivism risks, it has been recognized that "the monitoring system has a deterrent effect on would-be re-offenders" and "the ability to constantly monitor an offender's location allows law enforcement to ensure that the offender does not enter a school zone, playground, or similar prohibited locale." *Doe v Bredesen*, 507 F3d 998, 1007 (CA 6, 2007). It is against this backdrop that we look to the harshness of this punishment in light of other punishments and what other states have done.

> \* \* \*

> All of this is true, but it also ignores the ancillary societal benefit of this lifelong monitoring: to ensure that certain sex offenders will not again be in a position to exploit their potential victims—children, some of the most vulnerable individuals in our society. See [*United States v*] *Gould*, 568 F3d [459,] 472–473 [(CA 4, 2009)]. The high recidivism rate and vulnerability of the victims are the common

---

[3] *Smith*, 538 US at 103 and *McKune v Lile*, 536 US 24, 34; 122 S Ct 2017; 153 L Ed 2d 47 (2002).

elements that allow for lifetime electronic monitoring in CSC–II cases involving minor children, which distinguishes these crimes from those defendant highlights. [*Hallak*, 310 Mich App at 574-575.]

Defendant's attack on the proposition that sex offenders have a high recidivism rate only addresses one aspect of *Hallak*'s reasoning, and does not detract from these other points or the overall conclusion.

The court in *Wallace v New York*, 40 F Supp 3d 278 (ED NY, 2014), was faced with this same argument—that the recidivist rate for sex offenders was not as high as previously thought, so a state residency restriction was cruel and unusual punishment for a class of offenders who did not have a high recidivism rate. The court rejected that notion, holding that the other legitimate objectives of the state residency restrictions were unaffected by the differing research on recidivism rates:

> Credible data, suggesting that "concerns" over the recidivism risk among convicted sex offenders might be misplaced or overstated (*see* Am. Compl. ¶ 33 (citing a study by the United States Department of Justice, alleging that "95% of new sex crimes are committed by people other than registered sex offenders") 38; Pls. Opp., at 13 ("97 percent of sex crimes committed are committed by someone who is not on the registry.")), does not undermine the "rational connection" between restrictions on convicted sex offenders and the goal of protecting children. The implicit argument—that there is no need for residency restrictions which focus on convicted sex offenders, when such individuals only account for a fraction of all sex offenses—raises an issue of "efficacy" and "not whether the statute has a connection to a nonpunitive purpose." [*Does v*] *Snyder*, 932 F Supp 2d [803,] 813 [(ED Mich, 2013), rev'd sub nom 834 F3d 696 (CA 6, 2016)] (rejecting the argument that restricting the residency of registered sex offenders is irrational since "sex offender registry laws do not, in fact, reduce recidivism rates"); *see also Bulles* [*v Hershman*], 2009 WL 435337, at *6 (ignoring "social scientifi[c] [sic] research which suggests sex offender residency restrictions are i[n]effective [sic]"); cf. [*American Civil Liberties Union v*] *Masto*, 670 F3d [1046,] 1057 [CA 9, 2012)] (concluding that, regardless of whether *Smith* "overstated the risk of sex-offender recidivism" with studies cited therein, "a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest" in Nevada's registration requirements). [*Wallace*, 40 F Supp 3d at 319-320.]

*Wallace* also shows that the varying statistics/opinions and arguments on the recidivism rate of sex offenders are not new.

Second, the research used by some courts concerns sex offenders as a broad general class. See *Betts*, 507 Mich at 560-562; *Does #1-5 v Snyder*, 834 F3d at 704-705 (the court noted the limitations of the conclusions in these same studies: they looked at "a category that includes a great diversity of criminals, not just pedophiles"). In fact, both *Lymon* and *Does #1–5*, involved criminals who did not commit sexual offenses. *Does #1-5*, 834 F3d at 705. Those who never committed sexual offenses but were on sex offender registries were distinguished from "a serial child molester." *Id*. "[M]any (certainly not all) sex offenses involve abominable, almost

unspeakable, conduct that deserves severe legal penalties . . . ." *Id*. But *Hallak*, 310 Mich App at 560, involved a CSC-II conviction based upon sexual contact with a 12-year-old, while this case involves even more heinous and frequent sexual molestation of a child ages 11 through 12, and at the hands of her father. Indeed, in addressing the proportionality of the punishments, the *Lymon* Court noted that the "punishment must be tailored to a defendant's personal responsibility and guilt," *Lymon*, ___ Mich at ___; slip op at 32 (quotation marks and citation omitted), and unlike the non-sex offender in *Lymon*, as a convicted sex offender the SORA requirements are specifically tailored to defendant's conduct, see also *id*. at ___; slip op at 31 (recognizing that the defendant's crime did not have a sexual element and there was no indication that he posed a risk of committing sex crimes), 33 (distinguishing the defendant's crime with other statutory crimes that "involve a sexual component and often sexual exploitation of a child"), and 33 n 21 (again recognizing that registration requirements for crimes containing a sexual component, like the defendant's, are a punishment that is "more appropriately tailored to the offense at issue"). These facts take this case, and these crimes, outside of what was addressed in *Betts*, *Lymon*, and *Does #1-5*.

Third, both *Betts* and *Lymon* recognized that there is no clear consensus on this recidivist research. See *Betts*, 507 Mich at 561 & n 20; *Lymon*, __ Mich at __, slip op at 26 n 18. The Pennsylvania Supreme Court made this same point in *Commonwealth v Torsilieri*, ___ Pa ___, ___; 316 A3d 77 (2024), where it had remanded to the trial court for an evidentiary hearing on whether there was a consensus that the legislative finding that sex offenders have a high recidivism rate was incorrect. After hearing from three experts over three days of hearings, the trial court found that "80%-95% of all sex offenders will not reoffend," and therefore the irrebuttable presumption[4] was not universally true. *Torsilieri*, 316 A3d at 85.

The Supreme Court reversed, concluding that all three experts agreed that the recidivist rate for sex offenders was higher than the recidivist rates of non-sex offenders, and thus there was no consensus that the legislative findings supporting the challenged law—that "sex offenders pose a high risk of committing additional sexual offenses"—were untrue:

> In explaining this "consensus" burden, our Court in *Torsilieri I* was specific and clear regarding the relevant question to be answered on remand: "whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." [*Commonwealth v Torsilieri (Torsilieri I)*, 659 Pa 359; 232 A3d 567,] 594 n 22 [(2020)]; see also id. at 606 (Donohue, J., dissenting) (agreeing that the operative inquiry was whether sex offenders are committing new sex crimes at a higher rate than those who are convicted of non-sexual offenses, thereby justifying the legislature's differential treatment). Indeed, this was the same discrete inquiry undertaken by our Court in *In re JB* [630 Pa 408;] 107 A3d

---

[4] Apparently in Pennsylvania a party can challenge the irrebuttable presumption given to legislative findings by use of a three-pronged test. *In re JB*, 630 Pa 408, 432; 107 A3d 1 (2014). The legislative finding at issue in *Torsilieri* was that "[s]exual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." *Torsilieri*, 316 A3d at 80, quoting 42 Pa C S § 9799.11(a)(4) (quotation marks omitted).

[1,] 17 (finding a scientific consensus that juveniles convicted of sexual crimes commit new sexual crimes at a rate "indistinguishable" from juvenile non-sexual offenders).

Thus, to meet his heavy burden of establishing that the General Assembly's presumption was not universally true, Appellee was required to establish that there exists a scientific consensus that sexual offenders pose no greater risk of committing additional sexual crimes than other groups not subject to similar registration laws. Informing our understanding of our Court's mandate and this prong of the irrebuttable presumption doctrine, we simply add that a "consensus" is a generally accepted opinion or general agreement regarding a proposition.

* * *

However, we remanded for evidence and argumentation regarding the issue as we framed it. This is because the General Assembly deemed sexual offenders to be a special class that presented unique risks, justifying different treatment than non-sexual offenders. To overturn the legislative presumption that sex offenders are more likely as a group to commit new sex offenses, we must conclude there is a universal consensus that this presumption is wrong. There cannot be a mere disagreement among experts; there must be clear and indisputable evidence for us to take this extraordinary step, as the General Assembly made a considered policy choice that sex crimes were uniquely abhorrent to the victims and society, and relying on the presumption that, as a group, those who commit such crimes are more likely to commit another crime of a sexual nature.

Again, the meaningful statistical measure is whether the percentage of those who have committed a sexual offense and go on to commit a second sexual offense—the group SORNA targets—is higher than the percentage of those who first commit a non-sexual offense followed by a second, sexual offense. It is this presumed difference in the rates of commission of sexual offenses, as recidivist offenses, between the two groups of offenders on which the legislature rested SORNA's registration and notification scheme.

Here, *Appellee's own experts concede that adult sexual offenders reoffend at a rate of at least three times higher than other individuals convicted of non-sexual offenses. Accordingly, rather than refuting it, the evidence supports the legislative presumption; the evidence validates the statutory underpinnings of Subchapter H. We need go no further.* Having reviewed the arguments and the evidence presented below, we find that the evidence does not demonstrate a consensus that the presumption at issue is not universally true. [*Torsilieri*, 316 A3d at 98-99 (citations omitted; emphasis added).]

Similarly, nothing has changed legally to modify our holding in *Hallak* that lifetime electronic monitoring for a defendant convicted of CSC-II is an unconstitutional unreasonable search. Defendant is correct that this Court did cite a high recidivism rate as one of the justifications for its conclusion. *Hallak*, 310 Mich App at 580-581. But again, this Court was

analyzing CSC-II involving a child victim, and not recidivism of the general class of sex offenders. *Id*. at 579. The Court also pointed to factors such as "punishment, deterrence, and the protection of some of the most vulnerable in our society against some of the worst crimes known," *id*. at 580, in addition to the high recidivism rate. As has already been discussed, defendant's argument that an individualized assessment of risk would make any difference for him is eminently unconvincing. Defendant makes no argument about how the monitoring will interfere with his life, and conveniently ignores that he repeatedly sexually abused his own child, over a long time period, when he was alone with two children. He does not argue that his location data will be used in any way other than ensuring that he is not placing himself in prohibited situations around children. Carrying such a device is not an unreasonable invasion of defendant's privacy, given his history and the public interest in protecting children. See *Hallak*, 310 Mich App at 581. The statutory lifetime electronic monitoring requirement, as applied to defendant, is not an unreasonable search.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado